STATE OF MISSOURI, RESPONDENT. v. J. J. TYLER, APPELLANT.*

In the Springfield Court of Appeals. Opinion filed July 17, 1926.

**1.—Witnesses—Testimony Impeaching Defendant's Reputation for Morality —Admission under Circumstances Held Reversible Error.** Admission of impeaching testimony that defendant's general reputation for morality was bad **held** reversible error, where kind of morality inquired about was not explained, and witnesses disclosed on cross-examination that they had no proper understanding of the term as used.

**2.—Criminal Law—Witnesses—Cross-examining Witness as to His Own Reputation for Morality.** Refusal of trial court to permit impeaching witness, testifying as to defendant's bad reputation for morality, to answer question as to whether he knew his own reputation for morality, **held** error, though not alone ground for reversal.

*Corpus Juris-Cyc. References: Criminal Law, 17CJ, p. 313, n. 46; Witnesses, 40 Cyc, p. 2595, n. 7; p. 2600, n. 34; p. 2601, n. 37; p. 2637, n. 55.

Appeal from the Circuit Court of Pemiscot County.—Hon. Henry C. Riley, Judge.

REVERSED AND REMANDED.

*Ward & Reeves* and *L. H. Schult* for appellant.

(1) The court erred in admitting incompetent, irrelevant and immaterial evidence on behalf of the State over the objections and ex-

ceptions of the defendant at the time. The court permitted the State, over the objections and exceptions of the defendant, to ask witnesses if they were acquainted with defendant's reputation for morality. Morality was not defined to the witnesses and the nature of the proof offered was not restricted to the traits of character involved. The testimony of these witnesses clearly show that they had no conception of the meaning of morality. In the recent case of State v. Ross, 306 Mo. 506, the Supreme Court said: "A defendant may be impeached as any other witness may be. Since the defendant testified in the case the State had the right to prove that his reputation for truth and veracity was bad, and also to show that his general reputation for morality was bad, as affecting his credibility. The State, however, had no right to attack his character as a defendant; that is, it had no right to show that his reputation was bad in the particular respect which would affect his guilt or innocence of the crime charged." State v. Archie, 256 S. W. 803; State v. Baird, 288 Mo. 67; State v. Shuster, 263 Mo. 602; State v. Barker, 249 S. W. 77.

*Sam J. Corbett* for respondent.

(1) Defendant contends first for reversal of this cause, that the court erred in admitting irrelevant, immaterial and incompetent evidence on the part of the State. The point made is that it was error to permit the State to prove the defendant's bad reputation for morality. In the recent case of the State v. Ross, the Supreme Court of Missouri holds that a defendant after he has taken the stand and testified may be impeached as any other witness for truth and veracity and for morality. State v. Ross, 306 Mo. 506. The other elements of character testified to by the witnesses complained of by the defendant were brought by the defendant on cross-examination of the State's witnesses, and for that reason the defendant cannot complain of answers he invited. (2) There has always been a distinction drawn between general moral character and general reputation for being quarrelsome and dangerous, as affecting the credibility of a witness, the former affects his credibility, the latter does not. And morality cannot be hedged in the narrow limits of honesty and integrity, as defendant's counsel would insist, but it includes general moral depravity. A man might be honest to the extent of meeting his obligations, but morality has a wider meaning, for no one would insist that a moral degenerate, such as a libertine, etc., was a moral man, even though it was shown that he paid his debts. State v. Richardson, 194 Mo. 342.

BAILEY, J.—Defendant was convicted of a charge of possessing intoxicating liquor and his punishment fixed at a fine of $500 and

twelve months in the county jail of Pemiscot county. From this judgment defendant has appealed.

The State offered evidence tending to prove that defendant was accosted by officers in the nighttime while riding in an automobile on a public road, and on their command to stop, the car was driven past the officers, who, thereupon, ran along the right side of the car, which was going slowly, shouting and shooting their pistols in order to cause defendant to stop the car. Defendant was sitting on the right-hand side of the car and by the aid of a search light the officers saw him hurl a bottle containing a liquid onto the running board of the car, which was then immediately stopped. Upon examination the officers found, according to their testimony, that the liquid left remaining on the running board was corn whiskey.

Defendant testified that he did not throw a bottle containing corn whiskey against the running board, but that he did have a bottle of non-intoxicating "gin" containing less than one-half of one per cent alcohol sitting on the floor of the car and in his excitement because of the shooting and in an effort to stop his car, which another man was driving, he inadvertently knocked this bottle of gin onto the running board with his feet. He was corroborated in this testimony to some extent by one of the occupants of the car.

Defendant does not question the sufficiency of the evidence to sustain the conviction, but assigns as error the admission of the testimony of certain witnesses relative to defendant's reputation for morality offered in rebuttal for the purpose of impeaching defendant. Both appellant and respondent cite the case of State v. Ross, 306, Mo. 1. c. 506, as stating the law relative to such testimony, wherein the Supreme Court said: "A defendant may be impeached as any other witness may be. Since the defendant testified in the case the State had the right to prove that his reputation for truth and veracity was bad, and also to show that his general reputation for morality was bad, as affecting his credibility. The State, however, had no right to attack his character as a defendant; that is, it had no right to show that his reputation was bad in the particular respect which would affect his guilt or innocence of the crime charged."

There were three witnesses examined by the State in rebuttal to impeach defendant. The direct examination of witness Clark proceeded in the following manner:

"Q. Now, how long have you known defendant? "A. I think about five years, to the best of my knowledge.

"Q. Do you know his general reputation down there in that community where he lives for morality?"

(Defendant's objection to the question was here overruled.) "A. Yes, sir."

"Q. Is that reputation good or bad? A. Bad."

Defendant then moved the exclusion of the answer on the question of morality for the reason, among other things, that no proper foundation was laid for it. The motion was overruled.

The direct examination of the two other impeaching witnesses Mathis and Kearney were conducted in exactly the same manner.

On cross-examination of witness Clark he was asked what he meant by morality to which he replied: "A. Well, I mean his morals is not good, he is not moral first, he is a profane man, and he is not what I term—(interrupted)

A. He swears, and uses vulgar language."

The cross-examination of the witness Mathews brought out the following:

"Q. What do you mean by morality, Lib? A. Well, a man's conduct in the community where he lives, I suppose, that's the way I understand it.

"Q. His conduct for what? A. For being a good law-abiding, moral man.

Mr. Oliver: "We move the exclusion of this witness' testimony because he clearly shows by his answer he doesn't understand the question of morality.

By the Court: "Yes, it is not whether or not he is law abiding, Mr. Mathews.

"A. What does it take to make a moral man?

Mr. Oliver: "We again ask the exclusion of this witness' testimony because he is attempting to say here as a witness and yet he is asking what it means.

"A. I want to know—you have asked me a question.

"Q. Why did you testify it was bad if you didn't know? A. What I have heard is bad.

"Q. You have said you didn't know what a moral man was? A. I asked what it took—means moral.

"Q. What does it mean, you have said you know his reputation for morality; what is morality? A. Mr. Corbett said what had the people said about him. "Q. About his reputation for morality, that's what Mr. Corbett said and you said it is bad, tell this jury what morality means? A. Well, I told you as near as I know."

The witness further said he supposed it meant a man that went to church. The motion to exclude his testimony was overruled.

The cross-examination of the other impeaching witness, Kearney, proceeded as follows:

"Q. Bad for what? A. Selling liquor and violating the law in general.

"Q. And that's what you are basing your answer to Mr. Corbett's questions on? A. On his moral character, a man that violates the law.

"Q. You say selling liquor, is that why you say he is bad? A. I am just basing what I am saying on what people told me.

"Q. What do you mean by morality? A. I mean if a man is a moral man, he is a man that keeps the laws of his country and God too.

MR. OLIVER: "I move that be stricken out because that doesn't make up a man's morality, referring to his answer to the meaning of morality.

BY THE COURT: "Overruled."

MR. OLIVER: "Exception."

It is evident from the foregoing testimony that none of the witnesses had a clear or proper conception of the term "morality." The prosecuting attorney asked none of the questions which elicited from the witnesses the information as to what they understood the term to mean. All such testimony was brought out on cross-examination. It is now contended that defendant cannot complain of answers he invited. The question is whether the State may, over the objection of defendant, ask an impeaching witness in general terms what is defendant's reputation for morality in the community in which he lives, without in any manner explaining or defining the term and place the defendant in the position of asking such witness, at his peril, as to what he understands morality to mean. The question has been answered in the able opinion of Commissioner RAILEY in the case of State v. Archie, 256 S. W. 803, l. c. 808. After stating that the question relating to defendant's reputation for morality should be couched in proper legal language, the opinion continues as follows:

"That is to say, by way of illustration, if the State desires to attack the credibility of defendant by showing that his general reputation for honesty and fair dealing is bad, the question should be asked whether the witness knows the general reputation of defendant in the community where he lives for honesty and fair dealing, instead of asking whether he knew defendant's general reputation for morality. With the question thus propounded, the defendant would be informed as to what he had to meet. The witness would not be left in the dark as to the kind of morality sought to be elicited, and the court would be in position to determine whether the species of morality inquired about could be considered by the jury in passing upon defendant's credibility as a witness.

The witnesses in rebuttal were asked if they knew the general reputation of defendant for morality. They answered in the presence of the jury that they did, and were permitted over defendant's objection to say it was bad. Upon inspection of the testimony of said witnesses, in respect to above matter, it will be disclosed that none of them testified to any facts upon which the jury would have been justified in discrediting the testimony of defendant, yet they were all permitted

220 Mo. App. 21.

to tell the jury defendant's reputation for morality was bad. We accordingly hold that the form of the questions propounded in chief to the witnesses in rebuttal operated as an injustice to defendant, and enabled counsel for the state to deliberately get before the jury illegal and improper evidence, which the jury had no right to consider in passing upon defendant's credibility as a witness.''

While in the case at bar it does not appear that the prosecuting attorney had any intention of getting before the jury illegal testimony, as in the Archie case, nevertheless the result of the general question asked the witness was the same. We venture to say that invariably when witnesses are asked the simple question as to what a defendant's reputation for morality may be, their ideas of the term will be conflicting and confused. The right to ask the question in any form has not always met with approval in this State. [See State v. Pollard, 174 Mo. 607, 74 S. W. 969.] It is quite clear that when the question is asked, the witness and jury should at least be made to understand what the witness is called upon to answer.

The verdict in this case was for almost the maximum penalty. We, therefore, cannot say the evidence of these witnesses had no effect on the outcome of the case, notwithstanding the fact that the evidence was strongly against defendant.

A further point is made on the refusal of the trial court to permit the witness Clark to answer the question as to whether he knew his own reputation for morality. The question has been held competent in the case of State v. Wade, 270 S. W. 1. c. 301. However, we do not believe this error would be sufficient in itself to work a reversal of this case. For the reasons heretofore stated, the judgment should be reversed and the cause remanded. It is so ordered. *Cox, P. J.,* and *Bradley, J.,* concur.